Certiorari Granted, May 2, 2012, No. 33,565

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMCA-043

Filing Date: March 8, 2012

Docket No. 30,187

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

WILLARD BALLARD,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY
Stephen K. Quinn, District Judge

Gary K. King, Attorney General
Santa Fe, NM
M. Anne Kelly, Assistant Attorney General
Albuquerque, NM

for Appellee

Jacqueline L. Cooper, Chief Public Defender
Kimberly Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**SUTIN, Judge.**

{1}    Defendant Willard Ballard took his laptop computer and two external hard drives to a coworker's home and asked the coworker to install a software upgrade. After Defendant later told the coworker that he had child pornography on the computer and asked the coworker to erase the memory, the coworker viewed the pornography and then made the

computer and hard drives available for police viewing. The police seized the computer and the two external hard drives that were in the coworker's possession. The police then searched for child pornography and found it in multiple files, following which the police obtained a search warrant permitting the computer and the external hard drives to be sent for forensic analysis. Twenty-five files, consisting of or containing twenty-five separate images, constituted the basis for charging Defendant with twenty-five counts of sexual exploitation of children (possession) contrary to NMSA 1978, Section 30-6A-3(A) (2007).

{2}     Convicted of all twenty-five counts, Defendant appeals, claiming (1) based on double jeopardy grounds the twenty-five counts merge into one count consisting of a unitary course of conduct; (2) the district court erroneously denied his motion to suppress the contents of the external hard drive that contained the images; (3) because *Apprendi v. New Jersey*, 530 U.S. 466, 547 (2000) prohibits judicial fact-finding that directly affects sentencing, the district court erred when it reviewed evidence to determine the number of victims; (4) the district court erred in failing to grant Defendant's motion to dismiss where no *corpus delicti* existed without Defendant's extrajudicial statements to police; and (5) the district court erred in reconsidering Defendant's sentence sua sponte absent intervening circumstances providing a basis for amendment of the sentence. We hold on the double jeopardy point that the twenty-five counts should have been merged into five counts, requiring reversal of twenty counts on which Defendant was convicted, and we hold that the court did not err in regard to the remaining points.

**BACKGROUND**

{3}     Defendant asked his coworker, Daniel Etlicher, to do software updates on his laptop computer because Defendant did not have access to the internet where he lived and therefore could not download the updates himself. Defendant gave the computer and two external hard drives to Mr. Etlicher. Approximately two weeks later, Defendant called Mr. Etlicher, but Mr. Etlicher did not answer because he was eating dinner. Mr. Etlicher later received a text message from Defendant asking Mr. Etlicher to call Defendant. Mr. Etlicher called Defendant. During their conversation, Mr. Etlicher overheard Defendant tell another person that there was child pornography on the computer. Mr. Etlicher asked, "Are you serious?" After acknowledging to Mr. Etlicher that he had child pornography on his computer, Defendant stated that when he downloaded a pornography file he got everything that came with it. Defendant asked Mr. Etlicher to erase the memory on the two external hard drives.

{4}     Mr. Etlicher took the computer and external hard drives to work and met with his supervisor. In the presence of his supervisor, Mr. Etlicher turned on the computer and one of the first files that opened on one of the hard drives was one captioned as "child pornography." The two looked at the file, closed it, and the supervisor called the police.

{5}     Officer Daniel Mailman responded to the call. When the officer arrived at the workplace, the computer was on, and Mr. Etlicher showed the officer the same file that he and his supervisor had viewed earlier, which was described by the officer as a brief video

of a male and female of approximately eleven to thirteen years of age engaged in sexual activity. The officer told Mr. Etlicher to turn the computer off, and the officer seized the computer and external hard drives.

{6} Officer Mailman took the computer and external hard drives to his supervisor, Sergeant Max Stansell, who was aware of the investigation as to possible child pornography. Sergeant Stansell testified that it took him about five minutes, viewing approximately ten files, on the computer to find a file that he could positively identify as a child engaged in sexual activity with an adult. He then sealed the computer, placed it in evidence, and obtained a warrant for forensic evaluation. The computer and external hard drives were sent to Rocky Mountain Information Network (RMIN) for forensic evaluation.

{7} Defendant gave Sergeant Stansell a statement in which Defendant said he downloaded some files while he was in Illinois and admitted that he knew there were more than ten files containing child pornography. He said further that he had downloaded the files from a peer-to-peer computer program, that he was an "avid" user of the hard drives, and that he knew what was on them and where the items were on the hard drives.

{8} A computer forensics analyst with RMIN, Christopher Tschupp, testified that he made a bit-for-bit copy of the laptop hard drive and of the two external hard drives. Mr. Tschupp testified that this process makes an exact copy of all of the material on the hard drives so that the copy can be analyzed without disturbing the original evidence. More particularly, Mr. Tschupp reported that twenty-five files had been "created" or "downloaded" on five occasions. The State based its charges on possession of twenty-five files of downloaded images, divided into possession of eight files consisting of video clips and seventeen files consisting of still images. Of the twenty-five counts with which Defendant was charged, images for Counts 1-3 and 9-25 were downloaded April 7, 2007; the image for Count 8 was downloaded April 17, 2007; images for Counts 4 and 6 were downloaded May 11, 2007; the image for Count 7 was downloaded May 21, 2007; and the image for Count 5 was downloaded May 25, 2007. Defendant established on cross-examination of Mr. Tschupp that, as characterized by Defendant, the "E-Mule" program allegedly used by Defendant to download the files was "peer-to-peer" software on the laptop that allowed for direct file sharing from computer to computer upon entering keyword searches and did not involve purchasing or selecting files from a specific source. Mr. Tschupp testified as to each of the twenty-five images of children engaged in sexual activity that were displayed for the jury from two digital video discs (DVDs) made from the bit-for-bit copy prepared by Mr. Tschupp from the laptop and external hard drives. All of the illicit images Defendant downloaded were contained on only one of his external hard drives at the time the computer and hard drives were seized.

**DISCUSSION**

**The Suppression Issue**

**{9}** Defendant contends that the warrant requirement was violated three separate times when (1) with no warrant, an officer first viewed the computer and then seized Defendant's computer and hard drives; (2) with no warrant, another officer independently searched the computer after it was taken to the police station; and (3) the computer and the hard drives were forensically searched pursuant to a warrant obtained based on evidence unconstitutionally acquired from the warrantless search at the police station.

**{10}** We review the district court's denial of Defendant's motion to suppress to determine whether the law was correctly applied to the facts, viewing the facts in a light most favorable to the prevailing party. *State v. Rivera*, 2008-NMSC-056, ¶ 10, 144 N.M. 836, 192 P.3d 1213, *rev'd on other grounds*, 2010-NMSC-046, 148 N.M. 659, 241 P.3d 1099; *State v. Diaz*, 1996-NMCA-104, ¶ 7, 122 N.M. 384, 925 P.2d 4. A defendant claiming violation of a Fourth Amendment privacy right must show an actual, subjective expectation of privacy in the area searched and must show that the subjective expectation of privacy is one that society is prepared to recognize as reasonable. *State v. Bomboy*, 2008-NMSC-029, ¶ 10, 144 N.M. 151, 184 P.3d 1045; *State v. Gurule*, 2011-NMCA-063, ¶ 7, 150 N.M. 49, 256 P.3d 992, *cert. granted*, 2011-NMCERT-006, 150 N.M. 764, 266 P.3d 633.

**{11}** Defendant argues that he had a reasonable expectation of privacy in the contents of his computer and external hard drives, an expectation that he maintained and never lost at any point in time. Thus, he argues, his privacy was unlawfully infringed when Officer Mailman viewed and seized the computer and was continually infringed thereafter. In particular, Defendant argues that he had a heightened expectation of privacy in the entire contents of both of the external hard drives and in the computer's hard drive as containers of simultaneously stored legitimate, private, lawful information. Based on this standing, Defendant asserts that the police violated the warrant requirement in the Fourth Amendment and in Article II, Section 10 of the New Mexico Constitution. Defendant relies on *United States v. Burgess*, 576 F.3d 1078 (10th Cir. 2009), *United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999), *State v. Sublet*, 2011-NMCA-075, 150 N.M. 378, 258 P.3d 1170, and *Gurule*, 2011-NMCA-063.

**{12}** Defendant's authorities do not assist him. They are not applicable to the circumstances in this case, where Defendant lost any expectation of privacy he may have had once he gave the computer and external hard drives to Mr. Etlicher to update the software and admitted to Mr. Etlicher that child pornography existed on the computer. Even were there some question (and we do not think there is any question) in regard to a privacy expectation in the computer itself, there is no question that Defendant lost any expectation of privacy in the content of the external hard drives when he asked Mr. Etlicher to erase the memory on those drives. Defendant voluntarily placed control of the existing contents of the computer and the hard drives in Mr. Etlicher's hands.

**{13}** Under the circumstances, we cannot say that society is prepared to reasonably expect Mr. Etlicher to erase the memory as requested by Defendant or that society would affirm or ratify such action. We can say that society would reasonably expect Mr. Etlicher to report

4

the existence of contraband to a law enforcement officer who, as here, lawfully viewed the child pornography in accordance with the private search doctrine. *See Rivera*, 2010-NMSC-046, ¶¶ 16-17 (setting out the private search doctrine and indicating that *United States v. Jacobsen*, 466 U.S. 109, 115 (1984) "held that the opening of [a] package by the employees . . . did not violate the Fourth Amendment because of their private character" (internal quotation marks and citation omitted)).

**{14}** Although society will recognize an individual's expectation of privacy in a person's personal computer and external hard drives, Defendant lost his expectation of privacy when he voluntarily relinquished possession of the computer and external hard drives to Mr. Etlicher and specifically asked him to destroy the child pornography stored on the hard drives. Because Defendant lost any privacy expectation he may have had in the computer and external drives, Officer Mailman's seizure of them was reasonable and lawful under the Fourth Amendment and under Article II, Section 10 of the New Mexico Constitution. *See State v. Ryon*, 2005-NMSC-005, ¶ 23, 137 N.M. 174, 108 P.3d 1032 ("The touchstone of search and seizure analysis is whether a person has a constitutionally recognized expectation of privacy."). By the time of Officer Mailman's involvement, Defendant's expectation of privacy had been fully breached and lost by his own actions and statements, and it was not somehow regained before the officer and Sergeant Stansell observed the contents. Because we have determined that no unconstitutional search or seizure occurred, we reject Defendant's argument that the evidence obtained from the forensic search was tainted and therefore invalid pursuant to the fruit-of-the-poisonous-tree doctrine.

**The Double Jeopardy Issue**

**{15}** This is a unit-of-prosecution, double jeopardy case. We review this double jeopardy issue de novo. *State v. Leeson*, 2011-NMCA-068, ¶ 10, 149 N.M. 823, 255 P.3d 401. The first question in a unit-of-prosecution case is what is the appropriate unit of prosecution. *Herron v. State*, 111 N.M. 357, 359, 805 P.2d 624, 626 (1991). When the language of a statute does not indicate unambiguously whether the Legislature intended to create a separate offense for each of the multiple acts or whether it intended to create one offense for a continuous course of conduct involving multiple acts based on a single criminal intent, we turn to lenity and distinctness factors to guide our further analysis. *Id.* at 361, 805 P.2d at 628; *see State v. DeGraff*, 2006-NMSC-011, ¶ 35, 139 N.M. 211, 131 P.3d 61 (stating that the *Herron* indicia of distinctness include "the timing, location, and sequencing of the acts, the existence of an intervening event, the defendant's intent as evidenced by his conduct and utterances, and the number of victims"); *State v. Boergadine*, 2005-NMCA-028, ¶ 15, 137 N.M. 92, 107 P.3d 532 (stating that, after the first step in which we ask whether the statute clearly defines the unit of prosecution and we determine that the statute is ambiguous, we employ the *Herron* factors "to determine whether there was a sufficient showing of distinctness between a defendant's acts" (internal quotation marks and citation omitted)).

**{16}** The sexual exploitation of children statute in question here, Section 30-6A-3(A), reads:

5

It is unlawful for a person to intentionally possess any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if that person knows or has reason to know that the obscene medium depicts any prohibited sexual act or simulation of such act and if that person knows or has reason to know that one or more of the participants in that act is a child under eighteen years of age. A person who violates the provisions of this subsection is guilty of a fourth degree felony.

This Court has held that the unit of prosecution for possession in violation of Section 30-6A-3(A) is unclear, requiring the district courts to turn to the *Herron* factors. *State v. Olsson*, 2008-NMCA-009, ¶¶ 1, 7-10, 143 N.M. 351, 176 P.3d 340. On the other hand, with respect to the proscription in Section 30-6A-3(D) against manufacturing any obscene visual or print medium, this Court has held that the unit of prosecution is readily discernable. *Leeson*, 2011-NMCA-068, ¶ 17. The State contends that the unit of prosecution in Section 30-6A-3(A) is clear, with no need to engage in a distinctness analysis. We disagree, as reflected in the following discussion.

**{17}** The principal unit-of-prosecution focus in cases under Section 30-6A-3 is on the definition of "visual or print medium" because possession (under Subsection 3(A)) or manufacturing (under Subsection 3(D)) *of any medium* is what we must concentrate on in this case. "Visual or print medium" is defined as follows:

(1) any film, photograph, negative, slide, computer diskette, videotape, videodisc[,] or any computer or electronically generated imagery; or

(2) any book, magazine or other form of publication or photographic reproduction containing or incorporating any film, photograph, negative, slide, computer diskette, videotape, videodisc[,] or any computer generated or electronically generated imagery[.]

NMSA 1978, § 30-6A-2(B) (2001).

**{18}** In *Leeson*, this Court distinguished manufacturing from possession, stating that, with respect to manufacturing under Section 30-6A-3(D),"producing or copying a single image of child pornography is sufficient to constitute a violation[,]" and further explained that in *Olsson* we were left uncertain "whether the Legislature meant to criminalize the possession of a collection of child pornography or the possession of each individual image within that collection." *Leeson*, 2011-NMCA-068, ¶¶ 18-19; *see State v. Smith*, 2009-NMCA-028, ¶ 17, 145 N.M. 757, 204 P.3d 1267 (holding that the defendant "did more than possess pornographic images; he made a transportable, shareable copy of the images" and recognizing that such conduct was considered manufacturing).

6

**{19}** Section 30-6A-3(A) proscribes possession and this case involves the possession of visual or print medium consisting of computer or electronically generated imagery (which we will refer to as "image," "images," or "imagery") in video and still form downloaded through peer-to-peer file sharing.[1] Computer- generated images under that section are images of real children that are saved, loaded, or displayed on a computer or computer screen. *See State v. Alinas*, 171 P.3d 1046, 1050 n.2 (Utah 2007) (suggesting that future jury instructions should contain language indicating that a "computer-generated image" is properly defined as images of real children that are saved, loaded, or displayed on a computer or computer screen and defined as computer-generated virtual images). Two DVDs were admitted as State's Exhibits 1 and 2. Exhibit 1 contained eight video clips that were downloaded on four different dates. Exhibit 2 contained seventeen still images, all of which were downloaded on April 7, 2007, at approximately the same time. It appears that all of the images were contained in files stored in a subdirectory which was a peer-to-peer downloading program called E-Mule that was installed on Defendant's laptop.

**{20}** Defendant characterizes the ultimate storage of the contraband as contained in a single folder on a single external hard drive. The prosecutor represented to the court that these twenty-five images were charged so that no child or image was duplicated. The State asserts that, therefore, "there were twenty-five distinct sexual acts and at least twenty-five distinct victims in different locations." At a continued hearing on the motion to merge the counts, Exhibits 1 and 2 were reviewed by the court and counsel. The district court determined that each of the twenty-five separately charged images involved a different child victim and a distinct act.

**{21}** Defendant argues that our focus must be "on the distinctness involved in possessing more than one image, in a single file folder, downloaded on five dates, in two formats (still and video)." He shows that the State's answer brief addresses *Herron* in only one page and then "fails to analyze any factor other than the number of victims[,]" appearing "to treat [Defendant's] conduct as though he manufactured or distributed the images rather than assessing [Defendant's] actual conduct, which is limited to possession." He contends that "the number of victims is a highly problematic factor in the pure possession context[,]" citing and characterizing *Gurule*, 2011-NMCA-063, ¶ 21, as noting a qualitative difference between viewing or downloading, on the one hand, and creating one's own child pornography, on the other hand. Defendant argues that analyzing distinctness based on the number of children "is simply unhelpful to determining the distinctness of a particular possessor's conduct[,]" pointing out that past unit-of-prosecution cases involving victims involved direct interaction between the defendants and the victims.

---

[1] *See* http://en.wikipedia.org/wiki/Peer-to-peer_file_sharing, which describes peer-to-peer file sharing and states that "[i]n 2004, an estimated 70 million people participated in online file sharing."

**{22}** In sum, Defendant argues that in this case distinctness should be analyzed principally, if not solely, based on his knowledge or mens rea, and his acts or actus reus. In that regard, Defendant argues that his unique conduct, involving his anonymous "file sharing" acquisition peer to peer, could not have had the effect of furthering the pornography industry or of spreading any image beyond his single possession. He argues further that the proscribed visual or print medium here is not the image seen but, instead, is the computer through which the images are viewed. He reasons that, as defined in the dictionary, a "medium" is an instrumentality through which something is conveyed; ergo, it is the computer that is the proscribed visual or print medium. He argues, too, perhaps alternatively, that the contraband images, as "digital files," were nothing more than a type of substance no different than, say, an illicit drug contained in several baggies. *See State v. Quick*, 2009-NMSC-015, ¶¶ 17-21, 146 N.M. 80, 206 P.3d 985 (holding that "the prohibited act is simply possession of a particular controlled substance" even if based on "multiple packages" and further that the possession of methamphetamine stored in separate areas constituted a single count of possession, being a singular actus reus). That is, the digital files constitute a single substance, namely, "ones and zeros" possessed in separate collections or separate confined spaces on a hard drive. In Defendant's estimation, the circumstances call for the application of lenity and under the proper distinctness analysis only a single count, or, as hinted to by Defendant, at worst, five counts can be charged. He requests this Court to determine "that [twenty-five] counts of possession on a single medium violate double jeopardy and . . . that this Court vacate some or all but one of his convictions."

## A. Lack of Unit of Prosecution Clarity

**{23}** The clarity issue begins and ends with legislative intent. *See DeGraff*, 2006-NMSC-011, ¶ 32 ("In unit of prosecution cases, . . . we inquire whether the Legislature intended punishment for the entire course of conduct or for each discrete act." (alteration, internal quotation marks, and citation omitted)); *see also State v. Bernal*, 2006-NMSC-050, ¶ 14, 140 N.M. 644, 146 P.3d 289 ("[T]he ultimate goal is to determine whether the [L]egislature intended multiple punishments."); *State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 40, 136 N.M. 309, 98 P.3d 699 ("If the Legislature's intent is unclear, we presume the Legislature did not intend to fragment a course of conduct into separate offenses." (alteration, internal quotation marks, and citation omitted)).

**{24}** What strikes us as one unclear aspect of the unit of prosecution here, requiring analysis of distinctness, is how we are to determine the medium and its chargeable possession under Section 30-6A-3(A) when we examine the two definitions of "visual or print medium" in Subparts (1) and (2) of Section 30-6A-2(B). Subpart (1) addresses possession of individual items of visual medium such as a photograph, a negative, or a slide, but also includes items that could contain one or more individual images such as a film, computer diskette, videotape, videodisc, as well as computer or electronically generated imagery. Subpart (2) appears to refer to collections of the items listed in Subpart (1) in the form of publication or photographic reproductions. The dichotomy raises the question about whether the Legislature intended to treat individual items and collections of items differently

8

for purposes of prosecution. The dichotomy also raises questions, such as, (1) that which was at issue in *Olsson*—whether individual photographs contained or incorporated in a photograph or scrap book are to be charged separately, or are to be charged as a single possession, and (2) whether certain types of collections might fit more into one subpart than another. Here, Defendant raises the question whether possession of twenty-five images are to be charged separately or as a single possession based on the timing and manner in which they were collected and housed together in an external hard drive.

{25} Yet another clarity issue is how, if at all, the concept of actus reus, or here of "only one act of possession" should be applied under Section 30-6A-3(A) while employing the definitional subparts in Section 30-6A-2(B)(1) and (2). *See Quick*, 2009-NMSC-015, ¶¶ 18-19 ("Although this case involves two different possession-based offenses, nothing in the language of the statutes at issue suggests to us that the actus reus of these crimes—the control of all of a particular type of controlled substance by the defendant at a given time—should be construed differently."). Thus, for example, in the peer-to-peer downloading here, which may have entailed en gross digital file downloading in some or all instances, is the actus reus of the crime and therefore the chargeable possession of the medium based on the timing of downloading, the number of files downloaded, or how the images were contained? What effort, conduct, and placement, if any, must be characterized as a unitary and single act of possession?

{26} Further, and given the clarity issues we have discussed, also unclear is how and to what extent distinctness factors are to be employed. *See Herron*, 111 N.M. at 362, 805 P.2d at 629 (stating that "[e]xcept for penetrations of separate orifices with the same object, none of [the distinctness] factors alone is a panacea"). The State argues that we should consider the victims, given that the sexual exploitation of children legislation is special and unique, having been separated from child abuse legislation, and the further view that society understands the need to protect children from exploitation—being used as sexual objects—proscribed in Section 30-6A-3(A). When, if at all, do factors such as timing, location, sequencing, and intervening events, come into play? Defendant argues that only Defendant's knowledge, intent, and actions in the downloading and storage processes should be considered.

{27} The point of the foregoing clarity discussion is to drive home that Section 30-6A-3(A) does not clearly point to a unit of prosecution. Double jeopardy cases outside of this exploitation of children arena are not of much assistance. The pigeon-hole process in which our courts have been required to engage over the years to define the unit of prosecution has not been a particularly easy one. Evermore present now is our Supreme Court's insightful comment in *Swafford* and repeated in *Bernal* that "'[t]he case law is replete with failed attempts at judicial definitions of the same factual event.'" *Bernal*, 2006-NMSC-050, ¶ 16 (alteration in original) (quoting *Swafford v. State*, 112 N.M. 3, 13, 810 P.2d 1223, 1233 (1991)). One can easily see why the process forced the courts into the need to turn to the realm of lenity and to distinctness analyses, including guidelines such as the *Herron* factors. *Bernal*, 2006-NMSC-050, ¶¶ 14-15; *Herron*, 111 N.M. at 361, 805 P.2d at 628 (stating that

9

lenity is "to assist in resolving ambiguous legislative intent" through a distinctness analysis). In conducting a distinctness analysis, once acts are determined to be either unitary or distinct, lenity has served its purpose. *Bernal*, 2006-NMSC-050, ¶ 14 ("If the acts are not sufficiently distinct, then the rule of lenity mandates an interpretation that the [L]egislature did not intend multiple punishments[.]"); *Herron*, 111 N.M. at 361, 805 P.2d at 628. As it always is with ambiguous legislation, we are called on to interpret and clarify. And this we must do here, faced with ever-present, ever-changing, technology and methods of obtaining and possessing digital imagery.

## B.      Legislative Intent

{28}    In this case we settle on interpretations of Sections 30-6A-3(A) and 30-6A-2(B)(1) and (2) as they may be applied here and on resolving the unit-of-prosecution issue in this case, in the following manner. The unit of prosecution is ambiguously expressed in those statutes. Here, initial possession started at the point Defendant completed each digital file download of one or more illicit images. Defendant's possession continued as long as the image remained on his computer or on any external hard drive. The process of downloading and the manner of storage of the files does not complicate the possession analysis. Nor does anonymous or file-sharing acquisition play a significant role.

{29}    Blending lenity with an attempt to employ distinctness factors in this unusually difficult analysis of ambiguous legislation, in this fast-moving, astonishing, sometimes bewildering, digital age, we arrive at the following conclusions. First, the Legislature intended Subparts (B)(1) and (B)(2) to be separate avenues for charging unlawful possession of obscene visual or print medium under Section 30-6A-3(A). Second, Defendant's chargeable unlawful possession fits within Section 30-6A-2(B)(2) as possession of a form of reproduction "containing or incorporating . . . any computer generated or electronically generated imagery[.]" Third, Defendant's chargeable unlawful possession under Subpart (B)(2) consists of five separate and distinct downloads. Each of Defendant's five separate downloads was in the nature of a single bundling of images for possession purposes, little different than obtaining a book or magazine or other form of publication or photographic reproduction containing or incorporating a videotape or computer diskette, as set out in Subpart (B)(2).

{30}    We reject the State's argument that charging Defendant based on possessing multiple images with different victims conforms to legislative intent because the victims are the principal, if not the sole distinctness factor in possession cases and in this case. The circumstance of multiple images and victims can exist from possession of a single videotape or single computer diskette as described in Subpart (B)(1). Additionally, Section 30-6A-3(A) specifically recognizes that the medium may depict "one or more" under-aged participants in a prohibited sexual act. Thus, multiple images or victims depicted in the possessed medium cannot, under the definitions in the subparts, be identified as the principal or sole distinguishing or distinctiveness factor in determining what constitutes "obscene visual or print medium" under Section 30-6A-3(A). At the same time, we reject Defendant's

10

argument that only one count of possession is permissible based on his view that distinctness can be analyzed here principally or solely based on his knowledge, intent, and conduct.

**{31}** We respectfully recommend that the Legislature revisit Section 30-6A-2 with the rapid developments in this digital age in mind. That section was enacted in 1984 and amended in 1993 and in 2001. Significant changes have developed and will continue to develop in technology that have raised and will continue to raise puzzling questions if the statute remains as written. Further, if prosecutors continue to charge unlawful possession for each image or based on each separate victim, convicted defendants can conceivably be sentenced to imprisonment for tens of years for one peer-to-peer download of images that ultimately are received, contained, stored, and possessed essentially as one group or unit in one computer. If that is the Legislature's intent, this intent should be more definitely stated in the legislation than is currently described in Section 30-6A-2. At this point, this Court has no room to effectuate a broader interpretation of the present statute. We have done the best we can, hoping that our view of the Legislature's intent is correct, and continuing to engage in the difficult task of applying lenity and any applicable distinctiveness factor to arrive at a reasonable result under ambiguous legislation.

**{32}** We hold that Defendant was erroneously charged with and convicted on twenty-five counts. Those counts should have been merged into five counts as explained in this Opinion.

**The Sentencing Issue**

**{33}** Defendant asks that, if this Court determines that double jeopardy was not violated, we determine that the district court's factual determination of the number of victims "drastically affected punishment" and, therefore, the court erred under *Apprendi* in failing to submit that factual determination to a jury. We review this constitutional issue de novo. *State v. Smith*, 2000-NMSC-005, ¶ 6, 128 N.M. 588, 995 P.2d 1030.

**{34}** We agree with the State that *Apprendi* does not apply. Furthermore, Defendant's punishment was not enhanced beyond his base thirty-seven and one-half years punishment that consisted of eighteen months on each of the twenty-five counts. The district court considered the number of children exploited in considering whether to merge the counts. Nothing in the record shows that the court used these factual determinations in the sentencing process as sentencing factors or that the court's consideration of the number of children involved exposed Defendant to greater punishment. We reject Defendant's argument that essentially conflates the double jeopardy merger and unit-of-prosecution issue, which tests whether a defendant receives greater or lesser multiple punishments, with the *Apprendi* punishment enhancement issue. This is not an *Apprendi* issue.

**The Corpus Delicti Issue**

**{35}** Defendant contends that in order to establish corpus delicti, the State was required to present the actual hard drive in question to the jury instead of a third-generation copy of

11

the hard drive burned to DVD discs. Defendant argues that "the trial court erred in denying [his] motion to dismiss for lack of the corpus delicti, without which his extrajudicial statements to police are inadmissible."

**{36}** The corpus delicti rule provides that "unless the corpus delicti of the offense charged has been otherwise established, a conviction cannot be sustained *solely* on the extrajudicial confessions or admissions of the accused." *State v. Weisser*, 2007-NMCA-015, ¶ 10, 141 N.M. 93, 150 P.3d 1043 (alteration, internal quotation marks, and citation omitted). A purpose of the rule is "to prevent the conviction of those who confessed to non-existent crimes as a result of coercion or mental illness." *Id.* ¶ 14 (internal quotation marks and citation omitted). In *Weisser*, this Court found that the corpus delicti can be established "through independent evidence establishing the trustworthiness of [the d]efendant's extrajudicial statements plus independent proof of the loss or injury." *Id.* ¶ 26. Here, the district court determined that the DVD copies were sufficiently accurate to establish corpus delicti. We review de novo whether the corpus delicti was established. *See Weisser*, 2007-NMCA-015, ¶ 17.

**{37}** At the end of the State's case, defense counsel moved to dismiss on the grounds that at trial the State did not have the hard drive from which the DVDs were produced. The hard drives were in Arizona where they were tested. The State responded that their expert would testify about the DVDs that would be introduced at trial to verify that they came from the hard drive in question and that the images were unaltered. The court agreed to hear the foundation laid by the expert witness before ruling. The court understood that the hard drive was "condensed" on to DVDs for the jury's consideration so the parties could control the images viewed. The court opined that the hard drive need not be present as long as the witness could testify that the copy was exact.

**{38}** Mr. Tschupp testified that he made a bit-for-bit copy of Defendant's hard drives. A bit-for-bit copy makes an exact copy of the hard drive including not just files but also deleted information and any unallocated data. This is done to preserve the original data, and Mr. Tschupp then worked off his bit-for-bit copy of the hard drives. Mr. Tschupp identified the computer and external hard drives from photographs that he took. He then analyzed the exact copy of the hard drives and found child pornography images and videos on one of the hard drives.

**{39}** The DVDs, State's Exhibits 1 and 2, were not created by Mr. Tschupp, and the prosecutor noted they were created pursuant to the court's order. Defense counsel was given leave to voir dire Mr. Tschupp before the court ruled on the admission of the DVDs. The court then admitted the DVDs. Mr. Tschupp identified each file shown and testified as to its name and when it was downloaded onto the hard drive in question. Mr. Tschupp testified that those twenty-five images contained on the DVDs were the same images he saw on the bit-for-bit copy he made of Defendant's hard drive.

**{40}** Based on *Weisser*, Defendant states that the "traditional *corpus delicti* rule prevents conviction based solely on extrajudicial confessions, requiring additional proof that the charged crime was actually committed." *Weisser*, 2007-NMCA-015, ¶¶ 10, 36 (holding that an alleged victim's behavioral symptoms of abuse were insufficient proof of harm to support admission of the defendant's confessions to police). Defendant asserts that the corpus delicti consisted of the contraband images on the external hard drive containing them. He argues that because the actual hard drive as well as the forensically made copy were not produced at trial, the corpus delicti was missing—foundation evidence establishing the accuracy of the forensic copy may have in part justified admission of the DVDs, but the connection between the DVDs and the files possessed by Defendant was "grossly attenuated" having been made by an unidentified person from "another copy." Defendant complains that the court's finding that the DVD copies were made pursuant to a bit-for-bit process was in error, as was the court's ruling on the accuracy of the bit-for-bit copy, since the copies produced at trial were not made using that technique, thus making the evidence to establish corpus delicti "highly questionable" and insufficient to meet the trustworthiness test of *Weisser*. *See id.* ¶¶ 18, 25. Defendant also argues that although he agreed to the DVDs being used for the jury, "the actual hard drive was expected to be produced." Defendant asserts in his reply brief that he did not become aware of the State's failure to transport it from Arizona until after the State had rested its case. This appears to be inaccurate given that the State's expert had not yet testified.

**{41}** Defendant acknowledges that Mr. Tschupp presented "extensive foundational evidence regarding the accuracy of the forensic copy made of [Defendant's] hard drive" and agrees that such "foundation may have justified admission[,]" but states that the connection between the DVDs and the files Defendant possessed was attenuated, in that the DVDs were not themselves made using a bit-for-bit technique. He argues that "[t]he court's finding that the [DVDs] were made pursuant to the bit-for-bit process was in error" and "[a]s such, its conclusion that the discs are sufficiently accurate copies to establish *corpus delicti* is highly questionable."

**{42}** We are not persuaded by Defendant's arguments and hold that the district court did not err in denying Defendant's motion to dismiss for lack of corpus delicti. Defendant agreed with the process of copying the charged images onto the DVDs so as to keep uncharged images from the jury. *Cf. Midkiff v. Commonwealth*, 694 S.E.2d 576, 578 (Va. 2010) (holding that the trial court did not abuse its discretion in admitting a bit-for-bit copy of a hard drive where an expert "testified that [the] . . . copy of a hard drive is a reproduction of the actual hard drive without degradation and is considered forensically to be an original"). In addition, Defendant presented no evidence suggesting corruption or irregularity in any copying process, including copying the charged images onto the DVDs. *See id.* (admitting DVD of child pornography images reproduced from hard drives as reliable evidence when the defendant "made no assertions that the admitted photographs or video clips were in any way manipulated or altered from the images that resided on his computer's hard drives"). Defendant's statements that he possessed child pornography were admitted in evidence without objection before Defendant raised any corpus deliciti issue. Even were

13

admission of the statements questionable, there was abundant proof that Defendant possessed child pornography on his external hard drive without his own statements to the police. *See Weisser*, 2007-NMCA-015, ¶ 10 (stating that the corpus delicti rule provides that "unless the corpus delicti of the offense charged has been otherwise established, a conviction cannot be sustained *solely* on [the] extrajudicial confessions or admissions of the accused" (alteration in original) (internal quotation marks and citation omitted)). Furthermore, Sergeant Stansell had already testified, without objection, that Defendant said he knew he had downloaded more than ten files with child pornography. And Mr. Etlicher also had testified, without objection, that Defendant said there was child pornography on his computer.

**The Sua Sponte Amendment of the Sentence Issue**

**{43}** Sentencing was held on August 13, 2009, after Defendant completed a court-ordered, sixty-day diagnostic evaluation. The maximum time allowable was thirty-seven and one-half years as each of the twenty-five counts is a fourth degree felony carrying an eighteen-month sentence. *See* NMSA 1978, § 31-18-15(A)(10) (2007). The State noted that the diagnostic evaluation indicated Defendant felt no remorse for the victims depicted in the images and identified himself as the victim. Defendant was also described in the evaluation as a recluse with an isolated and transient lifestyle. He was living with a woman who was not a citizen and did not speak English, who had two daughters. The diagnostic report noted that this situation had overtones of grooming used by pedophiles to get access to children. The State asked for twenty-five years imprisonment followed by five years of probation.

**{44}** Defense counsel argued that Defendant's possession did not promote the industry of child pornography because no money was exchanged, that there was no allegation that Defendant ever touched a child inappropriately, that Defendant had no prior criminal history, and that his inability to feel remorse was a possible issue of mental illness. Defendant declined the invitation to speak to the court.

**{45}** At the hearing, the district court found Defendant was not a good candidate for treatment as noted in the diagnostic report. The court considered the victimization of the children in the images, the need to deter such conduct, and Defendant's lack of criminal history. The court sentenced Defendant to three years of imprisonment, suspending thirty-four and one-half years, followed by five years of supervised probation.

**{46}** Yet, when the parties again appeared before the district court the next day, the court said it believed it had placed too much emphasis on Defendant's lack of criminal history, and the court revised the sentence to nine years of imprisonment instead of three. The State said the court still had jurisdiction to modify the sentence as no judgment and sentence had yet been filed. Defense counsel said it was not sure of the court's ability to modify the sentence. The court stated:

I sentenced [Defendant] yesterday to basically three years and he'll have credit for time served. Since that hearing, I've been thinking of nothing else. This case [has] really caused me to examine what I had done and the evaluation of the evidence and I decided last night, in the middle of the night, that I had placed too much emphasis on [Defendant's] lack of any history. To his credit, he's apparently been a law-abiding citizen up to now and I sentenced what I thought was an appropriate sentence. Thinking back though of the evidence and balancing the interests that you must balance when you sentence someone—and these include issues related to deterrence, punishment, rehabilitation—factors such as that. One of the things that I'm considering is revising the sentence. I believe I have the authority still to do that. We don't have a [judgment and sentence] that's been signed. . . .

. . . .

Well, I have reconsidered my sentence of three years in prison and the five years of probation. I feel that doesn't adequately address what I need to do here. This is a type of crime that I haven't had much experience with as a judge and had no experience with as a lawyer. This is new, relatively new. So, that's why I do feel that after giving it additional consideration that I will revise my sentence in two ways.

**{47}** Defendant acknowledges that a district court has authority to reconsider and amend a sentence before the sentence is entered and final, but nevertheless complains that the amendment was improper in that the district court lacked authority to amend because it was not triggered by any circumstances warranting reconsideration and amendment. Defendant contends that our standard of review is de novo, because the issue is a legal one involving the appropriateness of the court's authority to alter its sentence under the circumstances, citing *State v. Lopez*, 1996-NMCA-101, ¶ 13, 122 N.M. 459, 926 P.2d 784, which discusses differing standards of review on different issues. The State contends that our review is abuse of discretion because the court considered the various sentencing factors, citing *State v. Segotta*, 100 N.M. 498, 501, 672 P.2d 1129, 1132 (1983), which involved review of a district court's consideration of various factors when sentencing within a presumptive sentence range, but did not explicitly state a standard of review. Both are correct. We review the legal issue of authority de novo and the issue of the propriety of a sentence for abuse of discretion.

**{48}** We hold that Defendant has failed to provide authority or persuasive argument that supports a theory that the district court cannot change its oral sentence pronouncement after reflecting on it overnight. We see nothing in law or the evidence that indicates any lack of authority that would prohibit the district court's change of mind and oral sentence under the circumstances. Furthermore, the court's explanation for changing the sentence does not reflect whim, arbitrariness, or irrationality. We see no basis on which to conclude that the

15

district court abused its discretion. *See State v. Diaz*, 100 N.M. 524, 525, 673 P.2d 501, 502 (1983); *State v. Rushing*, 103 N.M. 333, 335, 706 P.2d 875, 877 (Ct. App. 1985).

**CONCLUSION**

**{49}** We reverse Defendant's convictions and remand for further proceedings consistent with this Opinion.

**{50}** **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**CELIA FOY CASTILLO, Chief Judge**

_____
**TIMOTHY L. GARCIA, Judge**

**Topic Index for *State v. Ballard*, Docket No. 30,187**

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-FA | Fourth Amendment |
| CT-SU | Suppression of Evidence |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-SE | Sexual Exploitation of Children |
| | |
| CA | CRIMINAL PROCEDURE |
| CA-CC | Corpus Delicti Rule |
| CA-DJ | Double Jeopardy |
| CA-MR | Motion to Suppress |
| CA-SZ | Search and Seizure |
| CA-WS | Warrantless Search |
| | |
| **ST** | **STATUTES** |
| ST-LI | Legislative Intent |
| ST-RC | Rules of Construction |